Argued and submitted October 7, 1987, certified question answered March 1, 1988

SENN,
*Plaintiff-Appellant,*

*v.*

MERRELL-DOW PHARMACEUTICALS, INC., et al,
*Defendants-Respondents.*

(USDC 84-1250-FR; USCA 86-3682)

SENN,
*Plaintiff-Appellant,*

*v.*

WYETH LABORATORIES, INC.,
*Defendant-Respondent.*

(USDC 85-1852-FR; USCA 86-3802; SC S34097)

751 P2d 215

Robert Kaufman of Rensberry, Nelson, Petruska & Allen-Moore, P.C., Gaylord, Michigan, argued the cause for plaintiff-appellant. With him on the brief was John Smallmon, Hermiston.

Ridgway K. Foley, Jr., Portland, argued the cause for defendants-respondents Wyeth Labs Division of American Home Products Corporation and Wyeth Laboratories, Inc. With him on the brief were Mary Davis Wilcox, Roland F. Banks, Jr., and Schwabe, Williamson & Wyatt, Portland.

Daniel M. Holland, Eugene, argued the cause for defendant-respondent Merrell-Dow Pharmaceuticals, Inc. With him on the brief were Denise G. Fjordbeck and Jaqua, Wheatley, Gallagher & Holland, P.C., Eugene.

CAMPBELL, J.

## CAMPBELL, J.

We have accepted certification of two questions from the United States Court of Appeals for the Ninth Circuit to resolve certain issues of tort liability under Oregon law. The questions certified to us are these: (1) Under Oregon law, if the plaintiff in a products liability action shows that two defendant drug manufacturers each produced a drug either defectively designed or defective because of failure to warn of risks inherent in the use of the drug but cannot show which manufacturer produced the drug plaintiff received, does the burden of proof shift from plaintiff to defendants to show that they did not cause plaintiff's injury? and (2) Is there liability for failure to warn if the plaintiff was required to take the drug by Oregon law?

In 1977 Mandy Senn, who was then five months old, received a vaccination against diphtheria, tetanus and pertussis (DTP or DPT). She later developed encephalopathy, which left her severely mentally and physically handicapped. Plaintiff sued under Oregon products liability law the several manufacturers of the vaccine alleging (1) that the manufacturers failed to warn of risks inherent in taking the vaccine, and (2) that the manufacturers produced a defectively designed vaccine.

State records reveal that only two of the drug manufacturers, Merrell-Dow Pharmaceutical (Dow) and Wyeth Laboratories (Wyeth), could have produced the vaccine Mandy Senn received.[1] The trial court dismissed the other defendants on their motions for summary judgment. Plaintiff cannot prove which of the two remaining defendants produced and supplied the vaccine she received. Plaintiff, relying upon the provisions of Restatement (Second) Torts § 433B (1965), contends that in this situation, each defendant should bear

---

[1] These records further reveal that in the 22 months preceding plaintiff's inoculation, Dow provided 73 percent and Wyeth 27 percent of the DPT vaccine the state acquired. Because neither the Court of Appeals nor the parties addressed the question to us, we do not now consider whether proof that a particular manufacturer's share of the relevant market is greater than fifty percent satisfies the preponderance of evidence standard on the issue of causation. *See, e.g.,* Kaye, *The Limits of the Preponderance of the Evidence Standard: Justifiably Naked Statistical Evidence and Multiple Causation,* 1982 Am B Found Res J 487; Rosenberg, *The Causal Connection in Mass Exposure Cases: A "Public Law" Vision of the Tort System,* 97 Harv L Rev 849, 869-74 (1984).

the burden of proving that it did not provide the vaccine. Plaintiff concedes, however, that Oregon has not, by case law or statute, adopted the principles of alternative liability stated in section 433B.[2]

In its orders granting defendants' motions for summary judgment, the trial court reviewed the leading cases on alternative liability, focusing on the California cases of *Summers v. Tice*, 33 Cal 2d 80, 199 P2d 1 (1948); *Sindell v. Abbott Laboratories*, 26 Cal 3d 588, 163 Cal Rptr 132, 607 P2d (1980) and *Sheffield v. Eli Lilly and Co.*, 144 Cal App 3d 583, 192 Cal Rptr 870 (1983). The court concluded that the principles enunciated in those cases did not encompass the facts of the instant case, stating:

> "Mandy Senn's complaint alleges that the DPT given to her was a defective product. Under the principle of alternative tort liability, it is not enough for Mandy Senn to plead and prove that the DPT administered to her was defective. She can only state a claim under a theory of alternative tort liability, if she claims injury resulting from the use of a drug intrinsically defective—*i.e.,* a drug generally defective even when used for the purpose for which it was marketed. Mandy Senn's claim does not allege injury from an intrinsically defective product such as DES.
>
> "In *Simpson v. Hillman*, 163 Or 357[, 97 P2d 527] (1940), the Oregon Supreme Court stated:
>
> > "It is well established that the causal connection between defendant's acts of omission and the injury must not be left to surmise or conjecture. The evidence must be something more substantial than merely indicating a possibility that the alleged negligence of the defendant was

---

[2] At oral arguments, a question arose regarding the effect of OEC 305. We agree with defendants' contention that this provision does not resolve the issue before us. OEC 305 reads:

> "A party has the burden of persuasion as to each fact the existence or nonexistence of which the law declares essential to the claim for relief or defense the party is asserting."

The commentary to this rule states that the rule is modeled on California Evidence Code section 500 and that

> "Rule 305 indicates that the burden of persuasion as to a particular fact rests on the party to whose case the fact is essential. It should be noted that the rule does *not* attempt to indicate what facts are essential to any particular claim for relief or defense. The elements of a prima facie case or defense are determined by substantive law, not by the law of evidence." (Emphasis in original.)

In this case, we seek to ascertain the elements of plaintiff's prima facie case as a matter of substantive law.

the proximate cause of the injury. When the evidence shows two or more equally probable causes of injury, for not all of which the defendant is responsible, no action for negligence can be maintained. In other words, negligence cannot be based on conjecture or speculation. It must be fairly and reasonably inferable from the evidence. [Citations omitted.] 163 Or at 364.

"Mandy Senn has conceded that she cannot prove which defendant drug company manufactured the allegedly defective DPT vaccine. Defendants are entitled to summary judgment in their favor."

For the reasons set out below, we conclude that the theory of alternative liability set out in Restatement (Second) Torts § 433B(3) (1965) is not available to plaintiff in her products liability claims for relief against defendants. We conclude also that the fact that plaintiff received the inoculation pursuant to a mandatory immunization program does not insulate defendants from liability.

## I. ALTERNATIVE LIABILITY

 We first consider whether a theory of alternative liability is available to plaintiff in this case. We begin by addressing defendants' contention that the legislature has resolved the question of availability of alternative liability theories in products liability cases by passing ORS 30.920, which adopts Restatement (Second) Torts § 402A and its attendant comments as the law of the state.[3] Defendants rely upon the

---

[3] ORS 30.920 reads:

"(1) One who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to the property of the user or consumer is subject to liability for physical harm or damage to property caused by that condition, if:

"(a) The seller or lessor is engaged in the business of selling or leasing such a product; and

"(b) The product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold or leased.

"(2) The rule stated in subsection (1) of this section shall apply, even though:

"(a) The seller or lessor has exercised all possible care in the preparation and sale or lease of the product; and

"(b) The user, consumer or injured party has not purchased or leased the product from or entered into any contractual relations with the seller or lessor.

"(3) It is the intent of the Legislative Assembly that the rule stated in subsections (1) and (2) of this section shall be construed in accordance with the Restatement (Second) of Torts sec. 402A, Comments a to m (1965). All references

language of comment *g* to that section. Comment *g* reads:

> "*Defective condition.* The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a *condition not* contemplated by the ultimate consumer, which will be unreasonably dangerous to him. The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed. *The burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained.*

> "Safe condition at the time of delivery by the seller will, however, include proper packaging, necessary sterilization, and other precautions required to permit the product to remain safe for a normal length of time when handled in a normal manner." (Emphasis added.)

Defendants contend that the reference to "the particular seller" imposes upon plaintiff the burden of precisely identifying the seller of the product causing the injury. However, a reading of the complete sentence in which that reference appears, and of the comment as a whole, reveals that comment *g* is concerned not with the source of the *product,* but with the source of the *defect.* If plaintiff proves that the vaccines produced by defendants were identically defective when they left defendants' hands and that this shared defect caused plaintiff's condition, the requirements of comment *g* are satisfied.

---

in these comments to sale, sell, selling or seller shall be construed to include lease, leases, leasing and lessor.

"* * * * *"

Section 402A of the Restatement reads:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Acceptance of defendants' argument would require us to read a passing reference in one comment as a purposeful declaration by the American Law Institute that the principle set out in § 433B(3) is not applicable in products liability cases. Nothing indicates that the ALI (or the legislature) intended such a reading. Comment *g* does not bar adoption of alternative liability principles.[4]

We next consider the existing Oregon precedent on this issue. As noted above, plaintiff concedes that this court has not yet adopted a theory of alternative liability. Only one Oregon case has addressed the issue of alternative liability. In *Anderson v. Maloney,* 111 Or 84, 225 P 318 (1924), the defendants, two Portland police officers, had arrested a robber and

---

[4] Defendants contend also that the vaccine they produce is entitled to "comment *k*" protection as an unavoidably unsafe product. We decline to make such a determination on the basis of the record before us. Comment *k* to Restatement (Second) Torts § 402A reads, in relevant part:

> "*Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. * * *. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."

On the basis of the record before us, we cannot conclude that the vaccine in question is entitled to protection under this comment. We agree with the Idaho Supreme Court's statement that

> "it is not for a court sitting on appeal to [determine whether a vaccine is entitled to comment *k* protection]. The determination would require a full evidentiary hearing such as only a trial court can provide. * * *."

*Toner v. Lederle Laboratories,* 112 Idaho 328, 339, 732 P2d 297 (1987). *See also Shackil v. Lederle Laboratories,* 219 NJ Super 601, 618, 530 A2d 1287 (1987). *But see White v. Wyeth Laboratories, Inc.,* Nos. 52108, 52564 (Ohio Ct App, July 30, 1987) (LEXIS, States library, Ohio file) (DPT vaccine qualifies for comment *k* protection). Issues of the vaccine's efficacy, the degree of risk attending its use, and the extent to which it is in fact *"unavoidably* unsafe" would require such a hearing. We note too that plaintiff challenges the existence and sufficiency of any warnings accompanying the vaccine; such warnings are a predicate to the comment's protection.

were taking him to jail when he broke free and fled. One of the officers shouted a warning at the fleeing robber; when he did not respond, the officers opened fire on him. One of the bullets fired struck plaintiff's decedent, a passenger in a passing streetcar, in the head. This wound later resulted in his death. Plaintiff was unable to prove which officer fired the fatal bullet. Consequently, plaintiff brought an action against both officers, pleading that both had acted negligently and without justification in firing their revolvers in the direction of the streetcar and that decedent's "death was directly caused by said negligence and carelessness, and wanton acts of defendants * * *." The jury returned a verdict against the defendants jointly.

This court reversed, concluding that, "[i]n a case of this kind, it is incumbent upon those who would profit and get gain by the untimely death of the decedent to point out, not only the particular negligence which brought about that death, but the identical individual who was guilty of the negligence." 111 Or at 96. The court considered plaintiff's allegation that defendants had acted without justification and concluded that their conduct was covered by a statute that justified the killing of a human being by public officers "[w]hen necessarily committed in retaking persons charged with or convicted of crime who have escaped * * *."

> "[I]t matters not how negligent either may be, he is not to be cast in damages for that negligence if it did not work any harm to the plaintiff. It has been shown that in the pursuit of a lawful undertaking, no one is liable for the negligence of his fellow-operator, committed in excess of authority or negligently without the concurrence of the former. In the instant case, there is no evidence whatever as to who fired the bullet that struck Askay. * * *. However, in the shooting described, according to the precedents cited only the negligence, if at all, of the one who fired the bullet that struck Askay can be taken into account in this case. The record is silent upon that subject. In brief, the plaintiff has utterly failed to prove who shot Askay."

111 Or at 93-94.

> "The case presented by the evidence in the instant case is one of complete failure of proof. All that has been shown is the mere happening of an accident. By whose fault it happened, if fault at all, is not disclosed."

111 Or at 95.

Though *Anderson* speaks directly only to pleadings of negligence, its principles are equally applicable to pleadings under a products liability theory. It is important to note, however, that the *Anderson* court did not consider the possibility of shifting the burden of proof to the defendants to prove noncausation. The California Supreme Court's solution to a similar situation in *Summers v. Tice,* 33 Cal 2d 80, 199 P2d 1 (1948), the case from which Restatement (Second) Torts § 433B(3) was derived, would not appear for another 24 years. Plaintiff would have us treat *Anderson* as an antiquated relic from a bygone era of tort law; defendants advance it as venerable but nonetheless vital precedent, applicable to the situation at hand.

Restatement (Second) Torts § 433B (1965) states, in relevant part:

> "(1) Except as stated in Subsections (2) and (3), the burden of proof that the tortious conduct of the defendant has caused the harm to the plaintiff is upon the plaintiff.
>
> "* * * * *
>
> "(3) Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each actor to prove that he has not caused the harm."

As noted above, subsection (3) is derived from *Summers v. Tice, supra.* In *Summers,* plaintiff and the two defendants, each armed with a twelve-gauge shotgun, were quail hunting when defendants negligently fired their guns in plaintiff's direction. Two birdshot pellets struck plaintiff in the face—one in his right eye and one in his upper lip. Plaintiff could not ascertain which of the defendants fired the shot that hit him. The California Supreme Court affirmed the trial court verdict in favor of plaintiff. The court stated:

> "When we consider the relative position of the parties and the results that would flow if plaintiff was required to pin the injury on one of the defendants only, a requirement that the burden of proof on that subject be shifted to defendants becomes manifest. They are both wrongdoers—both negligent toward plaintiff. They brought about a situation where the negligence of one of them injured the plaintiff, hence it should

rest with them each to absolve himself if he can. The injured party has been placed by defendants in the unfair position of pointing to which defendant caused the harm."

33 Cal 2d at 86. Though *Summers,* like *Anderson,* dealt with pleadings of negligence, the Restatement version of the rule applies to any "tortious" conduct.[5] The Restatement states that the rationale behind this exception to the general rule set out in § 433B(1) is to avoid "the injustice of permitting proved wrongdoers, who among them have inflicted injury upon the entirely innocent plaintiff, to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm." Restatement (Second) Torts § 433B, comment *f* (1965).

*Anderson's* focus was upon "those who would profit and get gain" as a result of defendants' tortious conduct, 111 Or at 96; the Restatement's upon "proved wrongdoers" and "the entirely innocent plaintiff," Restatement (Second) Torts § 433B(3), comment *f* (1965).

Wyeth has presented to us tables which purport to list courts that have rejected application of alternative liability in product liability cases. Wyeth asks us to join those courts. We will examine several of these cases in some detail and consider the applicability to the case at hand of the reasons the courts state for rejecting the theory. These cases arose as the result of actions against manufacturers and distributors of diethylstilbestrol (DES), a synthetic compound of the hormone estrogen. Between 1947 and 1971, DES was commonly prescribed, with FDA approval, to pregnant women as a miscarriage preventative. In 1971 a statistical correlation was announced linking use of the drug by pregnant women and the development of cellular abnormalities (including cancer) in the reproductive systems of their female children exposed to the drug *in utero.* The FDA banned the drug for use by pregnant women. The plaintiffs in these cases are the affected daughters and their husbands.

---

[5] Restatement (Second) Torts § 6 (1965) defines "tortious conduct":

"The word 'tortious' is used throughout the Restatement of this Subject to denote the fact that conduct whether of act or omission is of such character as to subject the actor to liability under the principles of the law of Torts."

This definition comprises actions brought under strict or products liability theories.

The California Supreme Court rejected application of alternative liability to multiple DES manufacturers in *Sindell v. Abbott Laboratories,* 26 Cal 3d 588, 163 Cal Rptr 132, 607 P2d 924 (1980). Plaintiff brought an action against five DES manufacturers. The court noted that in *Summers v. Tice, supra,* both of the parties who could have been responsible for the harm to plaintiff were joined as defendants and that there was a 50 percent chance that one of the two defendants was responsible for plaintiff's injury. In contrast, there were approximately 200 companies that might have been responsible for producing the DES that plaintiff's mother received, of which only five were before the court. The court reasoned that the "substantial likelihood that none of the five defendants joined in the action made the DES which caused the injury, and that the offending producer not named would escape liability altogether," combined with the relatively small chance that any particular producer was responsible for plaintiff's harm, militated against use of strict alternative liability. 26 Cal 3d at 603. The court instead sculpted a theory of "market-share" liability under which plaintiff is required to join as defendants DES producers representing a "substantial share of the appropriate market" to maximize the odds that the responsible party will be included in the action. *Id.* at 612. "Each defendant will be held liable for the proportion of the judgment represented by its share of the market unless it demonstrates that it could not have made the product which caused plaintiff's injuries." *Id.*

In *Collins v. Eli Lilly Co.,* 116 Wis 2d 166, 342 NW2d 37 (1984), the Wisconsin Supreme Court rejected application of alternative liability theory in DES cases because 1) defendants were apparently in no better a position than plaintiff to obtain evidence regarding DES production and marketing, 2) not all potential defendants were joined in the action, and 3) alternative liability theory does not provide a fair way to apportion damages among the many defendants, in that "defendants that produced or marketed small amounts of DES and those that produced or marketed large amounts would be equally liable." 116 Wis 2d at 183-84. The court rejected the *Sindell* theory because of "the practical difficulty of defining and proving a market share." *Id.* at 189. Instead, the court adopted a "risk contribution" theory under which plaintiff need bring an action against only one potential defendant, and prove

> "that the plaintiff's mother took DES; that DES caused the plaintiff's subsequent injuries, that the defendant produced or marketed the type of DES taken by the plaintiff's mother; and that the defendant's conduct in producing or marketing the DES constituted a breach of a legally recognized duty to the plaintiff."

*Id.* at 193. "If the plaintiff is able to prove these elements, the plaintiff may recover all damages from the one defendant." *Id.* at 194. If more than one defendant are joined, either by plaintiff or by named defendants, the jury will apportion damages among the defendants in accordance with principles of comparative negligence. *Id.*

The Washington Supreme Court, in *Martin v. Abbott Laboratories,* 102 Wash 2d 581, 689 P2d 368 (1984), considered and rejected application of alternative liability against DES manufacturers on the grounds that all potential defendants were not before the court and that "[t]he alternative liability theory does not, in its pure form, provide a fair way to apportion damages among the defendants." 102 Wash 2d at 595. The court rejected also the *Sindell* market-share theory because its "substantial share of the market" requirement distorts market liability. *Id.* at 601-02. The court went on to fashion its own theory, which it called "market-share alternate liability." *Id.* Under that theory plaintiff need commence suit against only one possible defendant. Named defendants may implead third party defendants. A particular defendant's liability is proportionate to its share of the relevant market. A presumption arises that all defendants possess an equal share of the relevant market. The burden is upon the individual defendants to produce exculpatory evidence or, if unable to exculpate themselves, to produce evidence that their individual shares of the relevant market are less than their presumptively "equal" shares. *Id.* at 605-06.

In *Zafft v. Eli Lilly,* 676 SW 241 (Mo 1984), plaintiff brought an action naming 13 DES manufacturers as defendants. The Missouri Supreme Court, noting that 151 companies manufactured DES during the time in question, rejected the application of alternative liability because "all possible tortfeasors [were] not before the court and the actual wrongdoers may escape liability." 676 SW2d at 244. The court considered it also relevant that the trial court found that the plaintiffs had "easier access to possible sources of information

than [did defendants]." *Id.* at 244-45. The court declined to adopt a market share liability theory absent legislative action. *Id.* at 247.

In a DES case not cited by defendants, *Mulcahy v. Eli Lilly & Co.,* 386 NW2d 67 (Iowa 1986), the Iowa Supreme Court, on a question certified from the federal district court, concluded that alternative liability was not available in an action against three DES manufacturers because not all possible defendants were before the court.

The Court stated:

"Assuming arguendo that plaintiffs have substantial evidence that DES from Lilly, Abbott [Laboratories], and [the Upjohn Company] was marketed in Ames, Iowa, plaintiffs' *Summers* problem is that they do not possess evidence to negate marketing of DES in Ames by other manufacturers. To say that the three named companies constitute the only possible manufacturers of the DES [plaintiff's mother] ingested is sheer speculation; any number of other manufacturers may have supplied DES to the Ames market."

386 NW2d at 74. The court reserved "for later consideration * * * the case which is genuinely factually analogous to *Summers v. Tice, supra.*" *Id.* at 76. The court declined to adopt any form of market-share liability, noting the "wide divergency of solutions advanced by courts in fashioning relief" and concluding that such solutions "involve[] social engineering more appropriately within the legislative domain." *Id.*

The instant case shares none of the principal impediments to application of alternative liability theory articulated in the cases considered above. Here plaintiff has brought before the court both of the potential defendants. There is no danger that the actual tortfeasor will escape liability.

The larger difficulty with alternative liability theory arises from the violence it does to the causation-in-fact element of tort law. The effect of applying a rule of alternative liability to a case in which neither defendant is able to produce exculpatory evidence is to impose liability where the probability of causation is 50 percent or less ("as probable as not" or "less than probable") as opposed to the traditional 50+ percent ("more probable than not") preponderance of evidence

standard and to impose liability on all defendants when in fact only one of them could have caused plaintiff's harm.

As the foregoing survey of DES opinions demonstrates, most courts considering the issue seem to feel that a rule of alternative liability modeled on *Summers* and section 433B is defensible where the number of defendants is small, but that such a rule breaks down and becomes "unfair" at some undefined point as the number of defendants increases and the likelihood that any particular defendant actually caused plaintiff's harm decreases. However, *none of the cases or commentaries presents a rigorous analysis of why it is "fair" to impose joint liability without a preponderance of proof of causation in some cases* (small number of defendants) *but not in others* (large number of defendants) *when the character of defendant's conduct and plaintiff's difficulty of proof is the same in either instance.*[6]

That a rule of alternative liability departs so dramatically from traditional tort principles by raising a presumption of liability on a 50 percent or lower probability of causation is not the only difficulty with such a rule. The rule purports only to shift the burden of proof to "each actor to prove that he has not caused the harm." Restatement (Second) Torts § 433B(3) (1965). No statement of the rule that we have found articulates the precise nature of that burden, however. In a two defendant situation the evidence is in equipoise. As to either defendant it is exactly as likely as not that that defendant caused plaintiff's harm. In theory, one of the defendants can escape liability altogether by presenting some scintilla of

---

[6] Neither do the cases adequately explain why shifting the burden of proof (thus creating a presumption of causation) is the proper remedy for the problem of proof plaintiff faces in an alternative liability situation. One justification advanced for the alternative liability rule draws upon the *Summers* court's statement that "[o]rdinarily defendants are in a far better position to offer evidence to determine which one has caused the injury." 33 Cal 2d at 86. It appears that the development of modern discovery rules has vitiated whatever force this argument might have had.

Another justification for shifting the burden of proof to defendants is that the burden more justly rests upon "proved wrongdoers, who among them have inflicted an injury upon the entirely innocent plaintiff" when "the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them caused the harm." Restatement (Second) Torts § 433B(3) comment f (1965). Characterizing defendants as "proven wrongdoers" and plaintiff as "entirely innocent" seems to have little relevance to the problem of the availability of evidence of causation in a multiple defendant case.

exculpatory evidence greater than that the other defendant produces, so that the evidence preponderates against the other defendant. Where there are three or more possible defendants, however, the necessary quantum of exculpatory evidence cannot be easily articulated. For example, if there are three possible defendants, it is less than likely (33 1/3%) that any one of them caused plaintiff's harm. What lesser degree of likelihood would a defendant have to prove to escape liability? Would that quantum shift with the number of defendants? Or should liability be imposed jointly against all defendants, regardless of number, unless they adduced evidence proving that it was "more than likely" that one of them caused plaintiff's injury, in which case that defendant would be solely liable? Or should each defendant have to prove by a preponderance of evidence that it was *not* responsible for plaintiff's harm?

■■ We conclude that adoption of any theory of alternative liability requires a profound change in fundamental tort principles of causation, an adjustment rife with public policy ramifications. The legislature may study and adopt one or another such theory, but we cannot pretend that any such theory is consistent with common law principles of tort liability. *See Norwest v. Presbyterian Intercommunity Hospital,* 293 Or 543, 551-53, 652 P2d 318 (1982). We are not persuaded to depart from the rule of *Anderson v. Maloney, supra.*

## II. MANDATORY IMMUNIZATION

The second question the Ninth Circuit certified to us involves the effect upon manufacturer's liability of a mandatory immunization program. At the time plaintiff received her inoculation, ORS 433.267(1) required that a child present as a prerequisite to school enrollment

"[a] statement signed by a physician or a representative of the local health department that he has received an initial immunization and prescribed reinforcing immunizations against the communicable diseases pursuant to rules of the Health Division as provided in ORS 433.273 * * *."

ORS 433.273 provided:

"The Health Division shall adopt rules pertaining to the communicable diseases for which immunization is required

and the approved means of immunization and indicated reinforcing immunizations under ORS 433.267, including recommended optimum ages for administration of such immunizations."

*Former* OAR 333-21-091(4) listed pertussis as one of the required vaccinations.[7]

■ Defendants have provided no rationale for their contention that this mandatory immunization program insulates vaccine manufacturers from liability. Nothing in the language of either the statute or the rule promulgated pursuant to it supports defendants' contentions. We conclude that the fact that plaintiff's inoculation may have occurred pursuant to a mandatory vaccination program does not insulate manufacturers for injuries resulting from their negligence or their defective products. *Accord, Flood v. Wyeth Laboratories,* 183 Cal App 3d 1272, 228 Cal Rptr 700 (1986).

## III. CONCLUSION

To summarize, we conclude that the rule of alternative liability set out in Restatement (Second) Torts § 433B(3) (1965) is not available to plaintiff in her products liability claims against defendants.

We further conclude that defendants are not insulated from liability because plaintiff received her inoculation as part of a government mandated vaccination program.

---

[7] ORS 433.267 currently imposes "[a]s a condition of attendance in any school or facility in this state" the requirement that every child receive "immunizations against the communicable diseases prescribed by rules of the Health Division as provided in ORS 433.273 * * *." ORS 433.273(1) authorizes the Health Division to promulgate rules implementing ORS 433.267's requirements regarding "[t]he required immunizations against diseases, including rubella, considered to be dangerous to public health * * *."

OAR 333-19-035(1)(a)(B) provides that

"[a]lthough Pertussis containing vaccine is recommended *(but not required)* for children up to the seventh birthday, particularly those in early infancy where the hazard of Pertussis is greatest, pediatric Diptheria/Tetanus vaccine (DT) may be substituted for DTP. DT vaccine is for use in children up to the seventh birthday * * *." (Emphasis added.)